**UNITED STATE DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| v. | ) | **Case No. 1:22CR00038-007 (AJT)** |
| | ) | |
| **CHRISTOPHER VANGRONIGEN,** | ) | **Sentencing: August 24, 2022** |
| | ) | |
| **Defendant.** | ) | |

<u>**DEFENDANT'S POSITION ON SENTENCING**</u>

At the time of his arrest on November 5, 2019, Christopher VanGronigen was in the throes of a multi-year devastating addiction to crystal meth. His addiction had isolated him from family and friends, had cost him his career and had impacted his ability to maintain steady and meaningful employment, and had taken a ravaging toll on his mental and physical well-being. Today, now thirty-five months removed from his arrest date, Mr. VanGronigen appears before this Court a completely different person. He is drug free. He has maintained his sobriety since the date of his arrest and continues to actively participate in the recovery process through his participation in Narcotics Anonymous and Crystal Meth Anonymous. He has served as both an inspiration and mentor to others who are working to overcome their own substance abuse addictions. He has reestablished relationships with friends and family that he had ignored or neglected when he was actively using drugs. Likewise, Mr. VanGronigen has restarted his career in retail store management and has progressed through several managerial roles with increased responsibilities. In short, Mr. VanGronigen has done everything anyone, or any Court, could have asked him to do over the past 3 years to make the most of the situation he admittedly put himself in.

It is for those reasons, and the ones that follow, that Mr. VanGronigen respectfully asks this Court to fashion a sentence that both recognizes his exceptional rehabilitation and progress

and that allows him to continue uninterrupted on his current path. It is rarely the case that a defendant such as Mr. VanGronigen will have had the opportunity to demonstrate to a court and the community such an extensive and impressive record of accomplishments and progress between an arrest and sentencing.  Given the record that exists before the Court today, a sentence without active incarceration is sufficient, but not greater than necessary, to comply with the federal sentencing purposes set forth in 18 U.S.C. § 3553(a).  In support of his position, Mr. VanGronigen provides the following:

## I.      THE PLEA AGREEMENT AND SENTENCING GUIDELINES

Mr. VanGronigen pled guilty on March 25, 2022, to a one count information charging him with conspiracy to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine (21 U.S.C. § 841(a)(1) and 846).  The maximum punishment for his offense is life imprisonment, a $10,000,000 fine, a $100 special assessment, and a lifetime on supervised release. The statute also ordinarily requires imposition of a mandatory minimum sentence of 10-years imprisonment unless the defendant meets certain requirements under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5C1.2 (Limitation on Applicability of Statutory Minimum Sentences in Certain Cases).  There is no dispute that Mr. VanGronigen meets the criteria set forth in U.S.S.G. § 5C1.2 and, therefore, the Court is not required to impose the 10-year mandatory minimum term of imprisonment.  *See* Presentence Investigation Report ("PSR") at 8, ¶32, and 15, ¶82.

The Probation Office has accurately calculated the Sentencing Guidelines in accordance with the recommendation proposed by the parties in their written plea agreement.  Thus, the agreed upon total offense level is 27, which corresponds to an advisory Guidelines sentencing range of 70-87 months. *See id*. ¶82. However, calculating the baseline advisory Guidelines range is merely

the first step in the federal sentencing process.  *See Gall v. United States*, 552 U.S. 38 (2007). After calculating the baseline Guidelines range, the Court must determine whether to apply any Guidelines-based departures to adjust the applicable Guidelines range.  *Id*.  Once the final advisory Guidelines range is determined, the Court then must consider the factors set forth in 18 U.S.C. § 3553(a) and decide whether a variance from the Guidelines is warranted based on the circumstances and features of the case and the defendant before it.  *Id*.  The § 3553(a) factors support a non-custodial sentence.

## II.   THE 18 U.S.C. § 3553(a) SETENCING FACTORS SUPPORT A NON-CUSTODIAL SENTENCE

Section 3553(a) requires district courts to consider the following factors in imposing sentence:  (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the kinds of sentences available; (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (4) the need to provide restitution to any victim(s).  18 U.S.C. § 3553(a)(1)-(7).  The end result of the analysis must be a sentence that is "sufficient, but not greater than necessary" to comply with four purposes of federal sentencing, i.e., the need for the sentence imposed (1) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; (2) to afford adequate deterrence to criminal conduct; (3) to protect the public from further crimes of the defendant; and (4) to provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2).  For the reasons that follow, the requested sentence is "sufficient but not greater than necessary" to serve the purposes of federal sentencing under the circumstances of this case.

### a. The Nature and Circumstances of Mr. VanGronigen's Offense Warrant a Variance from the Guidelines and the Sentences Imposed in Related Cases

The nature and circumstances of the offense are described in the PSR and the Statement of Facts (Dkt. 9). Mr. VanGronigen has admitted his role in a conspiracy to distribute methamphetamine over several years. And he has admitted liability for the entire scope of the conspiracy, including conduct carried out by other members of the conspiracy. But what is clear from the Statement of Facts and the conduct admitted by his co-conspirators, is that Mr. VanGronigen's role was far more limited than that of many other members of the conspiracy. Indeed, while some members acquired, possessed, and distributed kilos of methamphetamine, Mr. VanGronigen himself only involved himself with ounce-level quantities, the majority of which was for his own personal use. While his more limited involvement does not properly justify a minor role adjustment under the Guidelines, it does serve as a significant basis for supporting a substantial variance from the Guidelines range and the sentences imposed on others who obtained and distributed far larger quantities of methamphetamine.

For example, one co-defendant, Nathan Griffin, was found in possession of 884 grams of methamphetamine and another co-defendant, Robert Wildes, was found in possession of more than 4,000 grams of methamphetamine. (Dkt. 9, ¶3). Mr. VanGronigen, on the other hand, only obtained substantially lower quantities of meth. In fact, Mr. VanGronigen himself did not have direct connections to suppliers in New York and elsewhere and instead would accompany other co-conspirators when they set up deals to purchase from out-of-state suppliers. He would then be provided with portion of the supply that he had agreed to purchase, typically ounce quantities. *Id*. ¶¶3-4 (stating that Mr. VanGronigen himself "obtained ounce quantities of methamphetamine" and once was found in possession of 24 grams). So, while Mr. VanGronigen is properly held

criminally responsible for the total amount of drugs in the conspiracy, he personally was involved with much smaller quantities.

Moreover, Mr. VanGronigen's use and distribution consisted primarily of joining funds with other pre-existing users in advance of purchase and then sharing the meth amongst themselves according to their contribution. Drug conspiracies come in many different forms and co-conspirators can have varying levels of roles within in any conspiracy. And though they are all illegal and have negative consequences on users and society as a whole, the portion of the conspiracy Mr. VanGronigen engaged in did not involve selling drugs for his own personal profit, other than to help fund his own habit, and did not involve selling drugs to first-time users. Indeed, Mr. VanGronigen never sold or shared methamphetamine with any individual who was not already a habitual user. Instead, at most, Mr. VanGronigen served as a facilitator for acquiring and delivering drugs others had already decided to purchase. While his conduct was wrong and illegal, the true nature of how Mr. VanGronigen operated in the conspiracy warrants a substantial variance from the sentences imposed on other more large-scale participants in the conspiracy.

**b. Mr. VanGronigen's Personal History and Characteristics Demonstrate that he is Deserving of a Substantial Variance from the Recommended Guidelines Sentence**

In many ways, Mr. VanGronigen's personal background does not differ much from other individuals who have found themselves subservient to a serious drug addiction. He comes from a good family and he never lacked for attention or resources. He led a healthy life with steady employment and enjoyed the company of a large set of friends that he had made throughout different periods of his life. None of that, however, prevented him from falling into a drug scene that dominated his decision-making until the decisions were essentially no longer his. As the dozens of letters submitted on his behalf attest, Mr. VanGronigen slowly began to pull away from

5

friends and family that were not a part of his new-found scene.[1]  He began to only associate with similarly minded and focused friends until they were the only people he spent time with.  It impacted his work and both his physical and mental health.

Fortunately, that all changed when he was arrested in November of 2019.  Almost overnight, Mr. VanGronigen turned his life around.  He swore off drugs the day of his arrest and has held true to that decision.  Within a month and a half, he obtained full-time employment at a local retail store. He voluntarily enrolled in substance abuse counseling through 12-step meetings and the crystal meth anonymous fellowship. He has personally introduced several of the friends he used to use and share meth with to recovery.  He rediscovered his faith and became an active member in his church, the Knights of Columbus, and his community.

And he did all of this, not by court order or under the watchful eye of a probation officer, but on his own.  The government gave Mr. VanGronigen that opportunity and he has made the most of it.  And that speaks volumes about the type of person he is and can still become.

As the Court will see, the letters submitted on Mr. VanGronigen's behalf tell the story of two very different Chris VanGronigens.  The letters confirm the distance that grew between the writers and Mr. VanGronigen during the time of his involvement in the charged conspiracy.  And they also document his remarkable turnaround and the progress he has made since his 2019 arrest.

Just as moving as the letters sent by his friends and family are the letters submitted by those who have participated in the rehab process with him.  They prove his complete commitment to sobriety.  They also show that Mr. VanGronigen does more than just attend meetings but also

---

[1] All of the letters submitted on Mr. VanGronigen's behalf have been consolidated into Exhibit 1 to this pleading.  While the letters are not quoted directly herein, the Court is invited to read the letters in their entirety as they provide a clear picture of Mr. VanGronigen's life before, during, and after his offense conduct.

participates, leads, and encourages others in their own recovery.  And the letters from co-workers who have only known him post-arrest, demonstrate exactly how far his recovery has come.  Several of his former co-workers describe reacting with shock and disbelief when he told them about his arrest and pending charges/sentencing.  It is hard for them to imagine Mr. VanGronigen as anything other than what he is now – responsible, thoughtful, present and caring.

Finally, the Court should give considerable weight to Mr. VanGronigen's own letter to the Court.  *See* Exhibit 2.  While one would naturally expect a defendant to make a compelling argument on his own behalf, the sincerity of Mr. VanGronigen's letter stands out.  His letter provides intimate insight and detail into his addiction and his words are more than just lip service designed to tell the Court what he thinks, or his lawyer thinks, the Court might want to hear.  Mr. VanGronigen's actions speak far louder than his words but that is no insult to his letter.  In a justice system that does not produce a lot of win-win outcomes, Mr. VanGronigen's letter confirms that the government, the Court, the community, and Mr. VanGronigen and his family can and should all claim victory here. Mr. VanGronigen's transformation coupled with his clear and genuine commitment to serving his community and making amends for his conduct warrant this Court's consideration in imposing a sentence that will allow Mr. VanGronigen to continue with the path he is on.

### c.  A Non-custodial Sentence Would Not Create Unwarranted Disparity with Sentences Imposed in Related Cases

Mr. VanGronigen concedes, as he must, that the four defendants who the PSR lists as related cases all received custodial sentences to varying degrees.  However, a close look at the sentences imposed and the factual differences between those cases and Mr. VanGronigen's, support a finding that a non-custodial sentence would not create unwarranted disparity.

7

*Nathan Griffin* - Unlike Mr. VanGronigen, Griffin was ordered held following his arrest and received an enhancement under the Guidelines for being a manager/supervisor of the conspiracy.  He did not qualify for the "safety-valve" exception under the Guidelines due to a prior felony drug distribution conviction and was, therefore, not eligible to receive a sentence below the ten-year mandatory minimum.   He faced a low-end Guidelines range of 210 months and was sentenced to serve a term of 158 months. He eventually served approximately 5 years of the originally imposed 13+ year sentence.

*Damon Woods* - Woods was also held without bail at the time of his arrest and was found ineligible for the safety valve reduction under the Guidelines.  According to the government's sentencing memorandum, Woods was provided an opportunity to cooperate at the time of Griffin's arrest but instead chose to continue with the conspiracy.  His Guidelines recommended a sentence of 135 on the low-end and he was ultimately sentenced to the 10-year mandatory minimum.  He served approximately 3.5 years of the originally imposed sentence.

*Robert Wildes* – Wildes was released on bail at the time of his arrest but his bond was revoked a month later due to his prohibited contact with co-defendants and/or witnesses while released.  He likewise was ineligible for the safety-valve reduction and was initially found to fall into criminal history category III, which the Court later reduced to category II.  Notably, law enforcement seized approximately 4.8 kilos of methamphetamine from Wildes – by far the largest amount recovered from any individual in the conspiracy.  His Guidelines were calculated to be 188 months on the low end and the Court sentenced him to serve 136 months.  He ultimately served approximately 5 years of the imposed 11+ year sentence.

*Ryan Beda* – Beda was held without bail at the time of his arrest.  Unlike the above defendants, Beda did qualify for the safety-valve reduction, but his role in the conspiracy was

substantially larger than Mr. VanGronigen's.  Beda was the member who maintained a relationship with a supplier in New York following the arrests of other co-conspirators and Beda would in turn supply Mr. VanGronigen from the methamphetamine he obtained from his own source.  Beda also purchased quantities far in excess of that obtained by VanGronigen, often approaching half-kilo and kilo quantities.  His Sentencing Guidelines were calculated to be 87-108 months.  Beda was sentenced to 66 months and ultimately served approximately 2 years and 3 months of the original sentence.

As this Court is aware, Mr. VanGronigen was not only released at the time of his arrest but was later free of any court supervision when his initial 2019 charges were dismissed.  Likewise, Mr. VanGronigen was released on his own recognizance following his March 25, 2022, guilty plea and pending his sentencing hearing, when the Court found that his conduct since his 2019 arrest constituted exceptional reasons that overcame the mandatory detention provision that would otherwise apply under 18 U.S.C. § 3143.  Moreover, unlike the above four defendants, Mr. VanGronigen is in a far different situation than they were at the time of their sentencing hearings. Unlike those defendants, Mr. VanGronigen is almost three years removed from his arrest and has demonstrated a remarkable recovery and rehabilitation – a record that simply was not present in those cases.  And it is submitted that it is that very factor that most starkly separates Mr. VanGronigen's case from those of his related co-defendants.  A fair consideration of the remaining purposes of federal sentencing does not compel a different result.

### d.  A Non-custodial Sentence Would be in Line with the Purposes of Federal Sentencing Consideration

The first purpose of federal sentencing is "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  While under ordinary circumstances a period of confinement would be necessary to adequately account for these

considerations, the facts as they exist today suggest that continued supervision, as opposed to incarceration and the disruption that inevitably comes with it, is sufficient to fulfill this purpose of sentencing.  Mr. VanGronigen's own personal response to his arrest and prosecution reflects his recognition of the seriousness of his conduct and his demonstrated commitment to living a drug free and law-abiding life supports a finding that continued supervision through probation is a just punishment for *his* offense.

The second purpose of federal sentencing is "to afford adequate deterrence to criminal conduct."  We respectfully submit that a non-custodial sentence would not frustrate the goal of deterrence.  A strong message of deterrence has already been sent as a result of Mr. VanGronigen's prosecution and the fact that the justice system supported, encouraged, and recognized his rehabilitation efforts could have the effect of making other addicts realize, even before law enforcement intervention, that it is never too late to turn things around. A sentence that recognizes Mr. VanGronigen's exceptional rehabilitation will also encourage other defendants to follow a similar path.

The third purpose of federal sentencing is "to protect the public from further crimes of the defendant."  Every addict in recovery should acknowledge that sobriety is always a work in progress and one can never let their guard down.  However, Mr. VanGronigen's long track record suggests that he has truly seen the light and his sobriety appears to be on very strong footing. Mr. VanGronigen has conformed his conduct without any court supervision and is now years removed from his crimes.  Moreover, the way in which he has candidly shared his experiences with family and friends makes it likely that those close to him will recognize the signs of addiction if they surface again and will immediately intervene if necessary.  For those reasons, specific deterrence

does not appear to be a compelling reason to impose incarceration as opposed to a more useful period of continued supervision.

The fourth purpose of federal sentencing is "to provide the defendant with needed training, medical care, or other correctional treatment in the most effective manner."  It is respectfully submitted that to the extent Mr. VanGronigen requires additional training, medical care, or treatment, those needs are being more than adequately addressed in the community where he actively sought counseling and therapy and our best continued without interruption.

In sum, the § 3553(a) sentencing factors, when evaluated as a whole, militate in favor a non-custodial sentence.

## III.    CONCLUSION

For the foregoing reasons and any others that may appear to the Court or that may develop at the sentencing hearing, Mr. VanGronigen respectfully requests that this Court impose a non-custodial sentence.


Date:  August 17, 2022                    Respectfully submitted,

                                          CHRISTOPHER VANGRONIGEN
                                          By Counsel,

                                          /s/_____
                                          Stuart A. Sears (VSB 71436)
                                          SCHERTLER ONORATO MEAD & SEARS, LLP
                                          555 13th Street, N.W.
                                          Suite 500 West
                                          Washington, DC  20001
                                          Telephone:    (202) 628-4199
                                          Facsimile:    (202) 628-4177
                                          ssears@schertlerlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of August, 2022, I electronically filed a true copy of the foregoing motion with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all parties.

/s/
Stuart A. Sears (VSB 71436)
SCHERTLER ONORATO MEAD & SEARS, LLP
555 13th Street, N.W.
Suite 500 West
Washington, DC  20001
Telephone:     (202) 628-4199
Facsimile:      (202) 628-4177
ssears@schertlerlaw.com

12